**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0440n.06

**No. 09-5263**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Jul 19, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | MIDDLE DISTRICT OF TENNESSEE |
| BARRY MCKNIGHT, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  SILER and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

SUTTON, Circuit Judge.  Barry McKnight pled guilty to being a felon in possession of a firearm after the district court denied his motion under the Fourth Amendment to suppress some of the evidence against him.  McKnight now exercises his right under the plea agreement to appeal that decision.  Because the police possessed ample information indicating that McKnight had committed a crime, we affirm.

I.

On New Year's Eve 2006, Sergeant Joseph Towers, an 11-year veteran of the Nashville Police Department, received a call from a police dispatcher, informing him that a caller had reported

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

a man with a gun at 151 University Court. The report did not surprise Towers. In his experience, violent crime regularly plagued the University Court public housing complex, and he frequently heard reports of "persons with weapons" during New Year's Eve celebrations. This year proved no different: Erratic gunfire occurred throughout the evening at University Court.

As Towers pulled up to 151 University Court around midnight, the dispatcher gave him more information. The initial call arose from a domestic dispute, during which a man with a shotgun threatened the caller. The record does not reveal whether the caller, Ronisha Smith, disclosed her name to the police, but it does show that she identified herself as McKnight's girlfriend and told the police that, after McKnight pulled a shotgun on her, she ran from the apartment at 151 University Court to 63 Carroll Street (a building across from 151 University Court) where she called them. Smith gave the police a physical description of her assailant—a black male wearing black pants and a white shirt—and one thing more: the assailant's name, Barry McKnight.

Armed with this information, Towers waited for another officer to arrive so they could approach University Court together. As he waited, someone matching the assailant's description walked between 151 University Court and 63 Carroll Street. Towers called out, "Barry," and the man walked over to him. At that point, Towers asked him, "Are you Barry McKnight?" to which he responded, "yes." R.31 at 32.

Towers handcuffed McKnight and read him his *Miranda* rights. In response to Towers' subsequent questions, McKnight said he owned a shotgun and agreed to take the police to the gun.

McKnight led Towers and some other officers to the apartment at 151 University Court and showed them his shotgun.

A grand jury indicted McKnight for being a felon in possession of a firearm. McKnight moved to suppress the shotgun (and other evidence obtained from his apartment) on the ground that his initial arrest was unlawful. The district court denied his motion. McKnight pled guilty to being a felon in possession of a firearm, reserving his right in the plea agreement to appeal the district court's denial of his motion to suppress.

## II.

The Fourth Amendment protects "the right of the people" to be free from "unreasonable searches and seizures." U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643 (1961). Consistent with this language, officers may arrest—seize—an individual in public when they have probable cause to believe the individual committed a crime. *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001); *United States v. Watson*, 423 U.S. 411 (1976). The hallmark of probable cause is "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that [the defendant has] committed or [is] committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Certainty is not required; a "fair probability" will suffice. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The district court deemed Sergeant Towers' testimony about the events of New Year's Eve credible, and McKnight offers no basis for second-guessing that finding. Once Towers' version of

the facts is accepted, it does not take extensive analysis to conclude that Towers had sufficient information to arrest McKnight.

Smith told the police that her boyfriend had threatened her with a shotgun at 151 University Court. A crime victim's statement generally will suffice to establish probable cause, *see United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006), to say nothing of proof beyond a reasonable doubt in some settings, *see United States v. Arnold*, 486 F.3d 177, 180–84 (6th Cir. 2007) (en banc). Smith gave a description of her boyfriend (a black male wearing black pants and a white shirt) and his name (Barry McKnight). Towers' own observations confirmed Smith's statement. He saw a man matching this description walking toward 151 University Court (the location of the assault) from 63 Carroll Street (the location to which the victim fled). The man wore a light-weight shirt despite the colder weather, and unlike many of the people who passed through University Court that night, he was on foot. Both facts gave Towers reason to believe that McKnight had just come from the housing complex. Most critically, when Towers called out to the man, he answered to "Barry" and confirmed he was Barry McKnight. All told, these circumstances amounted to reasonably reliable information that McKnight had committed a crime.

McKnight resists this conclusion, arguing that *Florida v. J.L.*, 529 U.S. 266 (2000), demands more when an anonymous phone caller reports a crime. The record does not reveal whether Smith gave her name to the police dispatcher, but, even if we assume she did not, that is no reason to discount the phone call—a victim's phone call—in this instance. The risk presented by an anonymous tip is that the police have no recourse when the tip is false and few grounds for verifying

it. How can the police arrest someone for providing a false lead if they don't know who it is? And how can the police verify the bases for the tipster's knowledge if they don't know whom to ask? *See Florida v. J.L.*, 529 U.S. at 270; *United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005). But these cautionary considerations are just that: considerations. They do not establish an unbending requirement that the police may never rely on anonymous phone calls. *See Gates*, 462 U.S. at 230.

The police acted reasonably here. This "tip," for starters, was not just "a call made from an unknown location by an unknown caller" involving an unknown victim. *Florida v. J.L.*, 529 U.S. at 270. The phone call concerned a report of criminal activity against *her*. Smith gave the police her location—across from the crime scene—and identified herself as McKnight's girlfriend. The police readily could have found Smith based on this information had they needed to. Nothing in the record, moreover, suggests that Smith refused to give her name, only that at most an administrative error occurred because no one asked for her name and she never volunteered it. Add to all of this the specific and concrete nature of Smith's information—identifying McKnight by name and describing his clothing and location—and it is clear that the police acted reasonably in relying on this information to arrest McKnight when he acknowledged that was who he was.

McKnight attacks the credibility of Smith's report for another reason: it arose from a domestic dispute. But officers are under no obligation to take a victim's statements *less* seriously when the victim knows her assailant. *See Arnold*, 486 F.3d at 180–81; *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). The specificity

of Smith's identification makes the report of criminal activity more credible, not less so. Smith's phone call arose credibly from (and in the midst of) an alleged physical confrontation, as opposed to (less credibly) an out-of-the blue report invoking an estranged partner's past wrongs. *Cf. United States v. Phillips*, 727 F.2d 392, 397 (5th Cir. 1984). Might Towers have allowed McKnight, a possibly armed assailant, to continue on his way through a high-crime public housing complex, so Towers could further investigate the tips reliability? Sure, but the Fourth Amendment does not require him to take that risk. *See City of Ontario v. Quon*, No. 08–1332, ____ U.S. ____, slip op. at 14–15 (June 17, 2010).

McKnight insists that exculpatory information—his cooperative behavior and calm demeanor—diminishes the evidence of probable cause. The first problem with this argument is a a chronological one: Most of McKnight's cooperation with Sergeant Towers occurred *after* Towers handcuffed him. Because we assess probable cause based on what the officers knew at the time of an arrest, most of McKnight's evidence—his consent to search the apartment, his admission to owning a shotgun—does not undermine the probable-cause finding. *See Fridley v. Horrighs*, 291 F.3d 867, 874–75 (6th Cir. 2002). McKnight adds that he calmly responded when Towers called out his name, then confirmed his name when Towers asked him to do so, suggesting he had nothing to hide. But that is a potential inference, not a necessary one. While fleeing from an officer may suffice to arouse an officer's reasonable suspicions, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), cooperating with an officer does not necessarily diminish other evidence of wrongdoing, *cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 220 (1973). Otherwise, officers would have to establish

a higher standard of probable cause (or for that matter reasonable suspicion) for calm or seasoned criminals. That simply is not the case. *See United States v. Fisher,* 364 F.3d 970, 973–74 (8th Cir. 2004).

Because the police had probable cause to arrest McKnight, we need not revisit the district court's ruling that Towers arrested McKnight when he handcuffed him and read McKnight his *Miranda* rights. Once the officers had the requisite probable cause, they had the constitutional authority to arrest McKnight (the district court's characterization of the encounter) *or* to detain him under *Terry v. Ohio*, 392 U.S. 1 (1968) (the government's characterization of the encounter). Either way, the officers did not violate McKnight's Fourth Amendment rights.

III.

For these reasons, we affirm.